UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CLINTON  PARKER, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-999 |
| | § | |
| HYPERDYNAMICS CORPORATION, *et al*, | § | |
| | § | |
| Defendants. | § | |

**OPINION AND ORDER**

Pending before the Court is Lead Plaintiff Richard Cuneo's Motion to Consolidate (Doc. 57) and Motion to Dismiss. Doc. 78. Having considered the motion, response, reply, the facts in the record, and the applicable law, the Court concludes the Motion to Consolidate (Doc. 57) should be denied and the Motion to Dismiss (Doc. 78) should be granted.

**I.     Motion to Consolidate**

**A.     Background**

The pending Motion to Consolidate involves three civil actions in the Southern District of Texas against the same defendants. The first-filed case (Parker Action), No. 4:12-cv-999, is pending before the undersigned judge, and the later-filed cases, No. 4:14-cv-641 (Germani Action) and No. 4:14-cv-649 (Stahelin Action), are pending before Judge Sim Lake. The Lead Plaintiff in the Parker Action, Richard Cuneo, moves to have the actions consolidated in this Court, designating the first-filed Parker Action as the lead case. The motion is opposed by Robert McLarty, Dorothy LaRose, and Howell Poole, Jr. (collectively, the "HDY Investor Group" or "HDY"), who filed on the same day as the pending motion a motion to consolidate the Germani and Stahelin Actions in Judge Lake's court. No. 4:14-cv-641, Doc. 4. HDY

alternatively seeks appointment as Co-Lead Plaintiffs were this Court to consolidate all three Actions. Doc. 65.

On April 2, 2012, Plaintiff Clinton Parker, individually and on behalf of all persons who acquired the stock of Hyperdynamics Corporation between February 17, 2011 and February 15, 2012, filed the Parker Action against Defendants Hyperdynamics Corporation and its CEO Ray Leonard. Doc. 1. Parker alleges Defendants issued materially false and misleading statements resulting in artificially inflated stock prices. Specifically, Parker alleges Defendants Hyperdynamics and Leonard concealed the fact that the company would be unable to commence drilling its Baraka-1 well due to cost overruns and delays in drilling its Sabu-1 well. Doc. 1 ¶ 12. Parker cites 21 public statements during the class period either stating the second well was planned or omitting mention of it. Doc. 1 ¶¶ 25–50. On December 5, 2013, after two previous Lead Plaintiffs withdrew, Richard Cuneo was appointed Lead Plaintiff. Doc. 51. 43

On September 20, 2013 and again on February 7, 2014, Hyperdynamics disclosed it had been served with subpoenas pursuant to a Federal Corrupt Practices Act (FCPA) investigation. On March 13, 2014, Dennis Dale Germani, individually and on behalf of all persons who acquired the stock of Hyperdynamics Corporation between November 8, 2012 and March 11, 2014, filed the Germani Action against Defendants Hyperdynamics Corporation, Ray Leonard, Paul C. Reinbolt, and David Wesson. No. 4:14-cv-641, Doc. 1. Germani alleges Defendants issued materially false and misleading statements resulting in artificially inflated stock prices. Specifically, Germani alleges Defendants concealed the fact that the company lacked adequate controls and violated the FCPA. No. 4:14-cv-641, Doc. 1 ¶ 34. Germani cites 9 public statements during the class period referring to the company's drilling concession and failing to disclose that the concession was obtained through violation of the FCPA. No. 4:14-cv-641, Doc. 1 ¶¶ 19–36.

On March 14, 2014, one day later, Benjamin Stahelin filed an identical complaint. No. 4:14-cv-641, Doc. 1.

On March 26, 2014, pursuant to the Joint Motion for Scheduling Order, the Court ordered Cuneo to file an Amended Complaint. Doc. 55. On May 12, 2014, Cuneo filed the pending Motion to Consolidate and an Amended Complaint encompassing several elements of the Germani and Stahelin complaints: the class period was extended from September 29, 2009 to March 11, 2014; Defendants Paul Reinbolt and David Wesson, former Chief Financial Officers of Hyperdynamics, were added; and FCPA-related allegations were added. Docs. 56, 57. Also on May 12, 2014, the HDY Investor Group filed a Motion to Consolidate the Germani and Stahelin Actions in Judge Lake's court. No. 4:14-cv-641, Doc. 4. On June 16, 2014, Judge Lake postponed a scheduling conference until both Motions to Consolidate were resolved and ordered a new scheduling order within 30 days of the resolution should the matter remain in his court. No. 4:14-cv-649, Doc. 24.

### B.    Legal Standard

Federal Rule of Civil Procedure 42(a) grants trial courts discretionary authority to consolidate cases that "involve a common question of law or fact." The Fifth Circuit has urged district judges "to make good use of Rule 42(a) in order to expedite . . . trial and eliminate unnecessary repetition and confusion," even when opposed by the parties. *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1013 (5th Cir. 1977) (quoting *Gentry v. Smith*, 487 F.2d 571, 581 (5th Cir. 1973)) (citations omitted). Consolidation is permitted "as a matter of convenience and economy in administration," *Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 394 (5th Cir. 2004) (quoting *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496 (1933)) (citations omitted), though not "if it would prejudice the rights of the

parties." *St. Bernard Gen. Hosp., Inc. v. Hosp. Serv. Ass'n of New Orleans, Inc.*, 712 F.2d 978, 989 (5th Cir. 1983); *see Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1531 (5th Cir. 1993) (listing factors: (1) same court, (2) common parties, (3) common questions of law or fact, (4) risk of prejudice or confusion versus risk of inconsistent adjudications, (5) judicial economy); *cf. Mills v. Beech Aircraft Corp., Inc.*, 886 F.2d 758, 762 (5th Cir. 1989) (denying consolidation where first-filed action "was ready for trial" and the later-filed action was not); *St. Bernard*, 712 F.2d at 990 (same).

### C.    Discussion

Applying the consolidation factors from *Frazier*, all three Actions were (1) filed in the same district, (2) against the same defendants on behalf of overlapping classes of shareholders, (3) asserting violations of Sections 10(b) and 20(a) of the Securities Exchange Act. 980 F.2d at 1531. In regard to the third factor, the parties dispute whether the Actions present common questions of law or fact beyond the broad language of Section 10(b) and SEC Rule 10b-5. The alleged violations all involve "false and misleading statements regarding the Company's business and financial results." Doc. 1 ¶ 3; Doc. 56 ¶ 45 ("statements made by Defendants misrepresented and/or omitted material facts about the business, operations, and financial condition of Hyperdynamics"); No. 4:14-cv-641, Doc. 4 ¶ 6 ("false and/or misleading statements . . . about the Company's business, operations, and prospects"); No. 4:14-cv-649, Doc. 1 ¶ 6 (same). In the Germani and Stahelin Actions, however, the alleged false and misleading statements concern only FCPA violations.

> Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company obtained and retained oil and gas concession rights in violation of the U.S. Foreign Corrupt Practices Act and/or U.S. anti-money laundering statutes; (2) the Company lacked adequate internal and financial controls; and (3) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

No. 4:14-cv-641, Doc. 4 ¶ 6; *see also* No. 4:14-cv-649, Doc. 1 ¶ 6 (same). By contrast, the original Complaint in the Parker Action alleges only statements and omissions about budgetary shortfalls and logistical bottlenecks in Hyperdynamics's drilling program. Doc. 1 ¶¶ 25–50. The Amended Complaint combines both types of statements. Doc. ¶¶ 246–426.  HDY argues false or misleading statements about FCPA violations and statements about budgetary and logistical problems present distinct questions of law or fact. In response, Cuneo cites a New York federal court opinion broadly stating: "differences in causes of action, defendants, or the class period do not render consolidation inappropriate if the cases present sufficiently common questions of fact and law, and the differences do not outweigh the interests of judicial economy served by consolidation." *Kaplan v. Gelfond*, 240 F.R.D. 88, 91 (S.D.N.Y. 2007). In *Kaplan*, the court consolidated actions with different class period starting dates but with a "common pattern in their allegations: that defendants' statements to the investing public misrepresented or omitted to state material facts about the financial status of [defendants]." *Id.*; *see also Lloyd v. Indus. Bio-Test Labs., Inc.*, 454 F. Supp. 807, 812 (S.D.N.Y. 1978) (consolidating actions based on identical public statements regarding FDA approval of a drug); *Miller v. Ventro Corp.*, 01-CV-1287, 2001 WL 34497752, at *1 (N.D. Cal. Nov. 28, 2001) (consolidating actions based on identical earnings reports, with overlapping class periods, defendants, and causes of action); *In re Cendant Corp. Litig.*, 182 F.R.D. 476, 478 (D.N.J. 1998) (consolidating actions based on sequential disclosures of accounting irregularities over different putative class periods); *Dees v. Colonial BancGroup, Inc.*, CIV A 2:09CV112-MHT, 2009 WL 1033258, at *1 (M.D. Ala. Apr. 17, 2009) (consolidating "short-class" actions with "long-class" actions based on additional public disclosures, where "major action in both cases took place during the same period of time"). Cuneo also cites two cases involving complex multidistrict litigation, where consolidated actions

included somewhat different types of fraud. First, in litigation involving Enron Corporation, this Court consolidated numerous actions involving false financial reports, insider trading, and various other claims as a preliminary matter, noting that "consolidation for pretrial matters does not necessarily mean that the claims will all be tried together, especially where the nature of the evidence and damages issues differ substantially." *In re Enron Corp. Sec. Litig.* 206 F.R.D. 427, 438 (S.D. Tex. 2002). The Court explained, "it is centrally important to the litigants on both sides and to this Court, especially because there are so many parties involved and all are entitled to equal access to the evidence, that the discovery process not disintegrate into chaos and harassment." *Id.* at 451. In a more recent opinion, a court consolidated thirty cases arising from the initial public offering of Facebook, Inc. The cases involved two types of claims: false statements in prospectuses under Section 11 and unlawful trading by underwriters under Section 10(b), the latter requiring proof of scienter. *In re Facebook, Inc., IPO Sec. and Derivative Litig.*, 288 F.R.D. 26, 26 (S.D.N.Y. 2012). The court noted judges in the Southern District of New York "have routinely consolidated Securities Act and Exchange Act claims." *Id.* at 36. The court generalized the claims of Facebook shareholders as seeking relief "on behalf of similar classes, asserted against some of the same defendants, arising out of the same series of events" under "federal securities laws." *Id.* at 35; *see also In re MicroStrategy Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 431 (E.D. Va. 2000) (consolidating actions based on the same "central claim" of misrepresented revenues, though one action included a claim of insider trading, which the court found was "no obstacle to consolidation as it is clear that the . . . claims are inextricably intertwined, as allegations of insider trading are typically used to buttress an inference of the defendants' scienter"); *Blackmoss Invs., Inc. v. ACA Capital Holdings, Inc.*, 252 F.R.D. 188, 190 (S.D.N.Y.2008) (Securities Act and Exchange Act claims are "well-suited for consolidation.").

Here, Cuneo offers no authority for consolidating FCPA-related claims with ordinary securities fraud claims. Although the FCPA-related claims in the Germani and Stahelin Actions rely on fraudulent SEC filings under Section 10(b) as do the claims in the original Parker complaint, the FCPA-related claims involve a different type of wrongdoing under a separate statutory framework with different legal and ethical considerations for the factfinder. Furthermore, the history of Hyperdynamics's stock price reveals FCPA disclosures resulted in distinct losses to purchasers. During the original class period in Parker, Hyperdynamics's stock declined steadily from "around $4-5 per share" to $1.44 but increased during the amended period to above $6 per share, before crashing to $2.19 as a result of FCPA-related disclosures. Doc. 63 at 3. As for Cuneo's own losses, his original loss chart only shows purchases prior to the corrective disclosures about FCPA subpoenas, raising doubts about whether he even has standing to represent FCPA-related claims. Doc. 70-2. Cuneo responds that HDY represents an aggregation of unrelated plaintiffs with lesser financial interest in the litigation. Doc. 69 at 15. An amended loss chart filed with Cuneo's amended complaint, however, shows he purchased additional stock after the first FCPA disclosure but sold it all prior to the second FCPA disclosure. Doc. 70-6 at 8.  *See Dura Pharma., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (holding a plaintiff did not have standing to show loss causation where he completely sold out of a security by the time the operative corrective disclosure was made); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 38-40 (2nd Cir. 2009) ("in-and-out" plaintiff could not conceivably prove loss causation). In addition, notice of the Parker Action was only given to shareholders purchasing stock between February 17, 2011 and February 15, 2012, more than a year before the first FCPA disclosure and without any reference to FCPA compliance. Cuneo responds that later purchasers affected by FCPA disclosures have been adequately notified and

represented, arguing "[t]o be sure, the notice discussed the drilling of Sabu-1 and the impact of delays and increased cost estimates on the drilling of Baraka-1, but it did so in the context of conduct taken to comply with the PSC (i.e., the retention of Concession)." Doc. 69 at 8 n.10. The notice itself says nothing about conduct taken to retain the Concession, much less violations of the FCPA. Doc. 18-1.

HDY and Cuneo present conflicting authority from other districts on whether Cuneo may be subject to unique defenses as a "high-volume," "high-frequency," or "day" trader. Cuneo's 325 trades over three years do not appear to raise unique defenses merely on the basis of frequency. *See, e.g., In re Royal Ahold N.V. Sec. & ERISA Litig.*, 219 F.R.D. 343, 354 (D. Md. 2003) (appointing day trader as lead plaintiff and observing that "where false information and misleading omissions pollute the market, all types of investors are injured"). The question remains whether he relied on any of the FCPA-related omissions and would vigorously litigate a claim based on them.

In regard to the fourth and fifth *Frazier* factors, inconsistent adjudication and judicial economy, Cuneo and HDY appear to agree it would be preferable to coordinate the Actions in one court. A footnote in HDY's response, ostensibly in opposition to consolidation, supports consolidation so long as HDY is named Lead Plaintiff:

> Ultimately, some degree of coordination between the Parker Action and the FCPA Actions is inevitable and necessary. *All three above-captioned actions could be consolidated into a single action* or the Parker Action and FCPA Actions could be coordinated with each other. Regardless, under either scenario, Cuneo is not an appropriate lead plaintiff for the reasons discussed herein. If the Court does not consolidate the FCPA Actions with the Parker Action, it likely makes sense for either the FCPA Actions or the Parker Action to be transferred and all actions to proceed before a single judge, either Judge Harmon or Judge Werlein.

Doc. 65 at 3 n.2 (emphasis added). Cuneo maintains if the Actions are not consolidated Defendants "will be forced to file essentially the same motion papers . . . repeatedly produce the

same documents, respond to multiple sets of interrogatories and defend and take duplicative depositions," not to mention duplication of judicial workload. Doc. 64 at 5. Defendants, however, do not complain about this increased burden in their response, ambiguously stating they do not oppose consolidation, as it would appropriately address their right to a single adjudication, but it may "dilut[e] the focus of the matter" and result in premature dismissal. Doc. 63 at 3. Defendants note, "the original *Parker* action had essentially nothing to do with the allegations or the time periods pleaded in the *Germani* and *Stahelin* cases." Doc. 63 at 2. Subsequent to filing their Motion to Dismiss the Amended Complaint, Defendants submitted a Further Statement Regarding Consolidation, suggesting the Court may not deny the Motion to Consolidate since "both sets of claims were fully briefed in the Motion to Dismiss" pursuant to the Court's scheduling order. Doc. 79 at 3. Defendants provide no authority for this suggestion, aside from an inapposite statement in *Enron* regarding the Court's ongoing power to evaluate lead plaintiffs. Unlike in *Enron*, there is no sign of immanent "chaos and harassment against defendants" which would require preliminary consolidation of such distinct actions. 206 F.R.D. at 451.

## II.   Motion to Dismiss

### A.   Legal Standards

*1.*   Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Factual matter is limited to "documents attached to or incorporated in the complaint and matters of

which judicial notice may be taken." *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 379 (5th Cir. 2003).

 *2.*  Rule 9(b)

 Securities fraud claims must also satisfy the heightened pleading standard set out in Federal Rule of Civil Procedure 9(b): "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Fifth Circuit interprets Rule 9(b) to require "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent." *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citing *Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 177–78 (5th Cir.1997), *cert. denied,* 522 U.S. 966 (1997)).

 *3.*  PSLRA

 The Private Securities Litigation Reform Act of 1995 (PLSRA), which codified the judicially implied private securities fraud action under Section 10b-5, incorporates the requirement stated above under Rule 9(b) and common law that the plaintiff state with particularity each alleged fraudulent statement. 15 U.S.C. § 78u-4; *see ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002) ("The effect of the PSLRA in this respect is to, *at a minimum,* incorporate the standard for pleading fraud under Fed. R. Civ. P. 9(b)," including the "who, what, when, where, and how" of each alleged fraudulent statement.). The PLSRA provides two additional requirements: (1) "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed"; (2) "the complaint shall . . . state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4.

*4.*   Rule 10b-5

Section 10(b) of the Securities Exchange Act prohibits employment of manipulative and deceptive devices in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.l0b-5 (defining employment of manipulative and deceptive devices to include making "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"). The Supreme Court has interpreted Rule 10b-5 to provide a private action with the following elements, subject to the particularity requirements of the PSLRA: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

*a.*   Materiality

"A fact is material if there is 'a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.'" *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (citation omitted); *see Basic Inc. v. Levinson,* 485 U.S. 224, 231 (1988) (materiality is based on the "'total mix' of information made available" to the shareholder). Statements of material fact do not include puffery and certain forward-looking statements. Puffery includes "generalized, positive statements about the company's competitive strengths." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) (holding positive press release was not

actionable where "plaintiffs have not alleged that any of the historical representations in that press release were false"). The Exchange Act safe harbor excludes liability for any forward-looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5. Meaningful cautionary statements do not include boilerplate disclaimers but include "specific, concrete explanations that clearly identified and quantified the clearly present financial dangers." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 247 (5th Cir. 2009). Cautionary statements outside of identified forward-looking statements may limit materiality under the "bespeaks caution" doctrine. *Rubinstein v. Collins*, 20 F.3d 160, 167-68 (5th Cir. 1994) (explaining "the 'bespeaks caution' doctrine merely reflects the unremarkable proposition that statements must be analyzed in context" or "within the 'total mix of information'"). Overly general disclaimers may themselves be a form of fraud. *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981) "[T]o caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").

In the case of fraud by omission, an additional element closely related to materiality is the duty to disclose omitted facts. Rule 10b-5 does not create a duty to disclose in the absence of prior statements rendering the omission misleading. 17 C.F.R. § 240.10b-5 ("It shall be unlawful . . . [t]o omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."); *Basic*, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5.").

*b.*    Scienter

Scienter, or the "mental state embracing an intent to deceive, manipulate, or defraud," includes both knowledge and severe recklessness. *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961 (5th Cir. 1981). Severe recklessness is limited to statements that (1) involve an extreme departure from the standards of ordinary care, and (2) present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996). Under the PSLRA, scienter must be pleaded with particular facts that support a "strong inference" that the defendant acted with knowledge or severe recklessness. 15 U.S.C. § 78u-4. To find a strong inference, the court must first consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," although a strong inference "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Allegations of motive and opportunity may "meaningfully enhance the strength of the inference" but are not sufficient alone. *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (quoting *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001)).

*c.*    Connection with purchase or sale

The remaining four elements of a 10b-5 action require proof of proximate causation of the shareholder's injury. Plaintiffs must first prove "a connection between the misrepresentation or omission and the purchase or sale of a security." *Stoneridge*, 552 U.S. at 157. This element tracks Section 10(b) of the Exchange Act. 15 U.S.C.A. § 78j (prohibiting fraud "in connection with the purchase or sale of any security"). The statutory requirement has three parts: (1) a "connection" between the fraudulent statement or omission and (2) "purchase or sale" of a (3)

"security." In a suit brought by purchasers of stock on a securities exchange, only the first part is in dispute. The Fifth Circuit determines the sufficiency of the connection according to the liberal "touch" test, requiring only that the fraud touch or have some discernable connection to the purchase or sale. *Alley v. Miramon*, 614 F.2d 1372, 1378 (5th Cir. 1980); *see Superintendent of Ins. of State of N. Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971) ("in connection" provision "must be read flexibly, not technically and restrictively"). In other words, the fraud must somehow affect the value of a security. *Bissell v. Merrill Lynch & Co., Inc.*, 937 F. Supp. 237, 242 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998) ("[U]nless the alleged fraud concerns the value of the securities bought or sold, or the consideration received in return, such fraud is not "in connection with" the purchase or sale of a security within the meaning of Rule 10b–5.").

   *d.*   Reliance

Fourth, plaintiffs must prove "reliance upon the misrepresentation or omission" or "transaction causation." *Dura*, 544 U.S. at 341. Again, this element requires a "causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic*, 485 U.S. at 243. This element goes beyond the "in connection" element by requiring the plaintiff to show the fraud influenced the shareholder's evaluation of the stock. A plaintiff may prove reliance directly by showing "he was aware of a company's statement and engaged in a relevant transaction." *Erica P. John Fund, Inc. v. Halliburton Co.*, ___ U.S. ___, 131 S. Ct. 2179, 2184 (2011). There is a rebuttable presumption of reliance where the plaintiff demonstrates "that the alleged misrepresentations were publicly known (else how would the market take them into account?), that the stock traded in an efficient manner, and that the relevant transaction took place 'between the time the misrepresentation were made and the time the truth was revealed.'" *Id.* at 2185

(citation omitted). The defendant may rebut the presumption by showing "that the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply." *Halliburton Co. v. Erica P. John Fund, Inc.* (Halliburton II), ___ U.S. ___, 134 S. Ct. 2398, 2408 (2014).

e.    Economic loss

Fifth, plaintiffs must prove the fraud caused actual economic loss, for instance by proving securities were sold at a lower price. *Cf. Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 831-32 (8th Cir. 2003) ("However, stockholders can be damaged in ways other than seeing their stocks decline. If a stock does not appreciate as it would have absent the fraudulent conduct, investors have suffered a harm.").

f.    Loss causation

Sixth, plaintiffs must prove loss causation. This element is specifically provided in the PSLRA. 15 U.S.C. § 78u-4 ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). This element goes beyond economic loss by requiring Plaintiffs to connect each loss to the value of the security in the absence of fraud. This can be shown by: "(1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is *more probable than not* that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of price

drop." *Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 320-21 (5th Cir. 2014). The corrective disclosure may include a "series of partial disclosures." *Lormand*, 565 F.3d at 261. Other possible depressive factors may include "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura*, 544 U.S. at 343.

### B.    Discussion

Plaintiffs' 167-page Amended Complaint cites 49 public statements made by Defendants between September 30, 2009 and May 5, 2014.[1] In regard to Plaintiffs' FCPA-related claims, the first sixteen statements in the Amended Complaint, dated September 30, 2009 to February 14, 2011, in addition to nine statements dated March 29, 2011 to September 11, 2013, consist of general risk disclosures in SEC filings referring to corruption. *See, e.g.,* Doc. 56 ¶ 246 ("We operate in Guinea, a country where corrupt behavior exists that could impair our ability to do business in the future or result in significant fines or penalties."). Plaintiffs argue these statements contain omissions, rather than disclosures, of FCPA violations that Defendants knew had occurred. Plaintiffs cite three corrective disclosures about the FCPA investigation, dated September 30, 2013, March 12, 2014, and May 5, 2014.

In regard to the non-FCPA-related claims, Defendants cite thirteen statements dated February 17, 2011 to May 13, 2011 referring to Hyperdynamics's "two well" drilling program, statements which Plaintiffs argue imply the first well was on track and the second well was still feasible. Plaintiffs cite eight partial corrective disclosures dated December 14, 2011 to February

---

[1] The three other complaints in the Actions cite an additional 12 statements. The original Parker complaint cites five press releases and one public conference statement not cited in the Amended Complaint, consisting of general progress reports on the Sabu-1 well; the statements are dated April 7, 2011 to January 30, 2012, during which period Defendants made more relevant statements cited in the Amended Complaint that expressly refer to the two-well program. Doc. 1. The Germani and Stahelin complaints each cite six SEC filings not cited in the Parker complaints, dated November 8, 2012 to February 7, 2014, consisting of redundant or irrelevant statements about Hyperdynamics's ownership stake in the Concession. No. 4:14-cv-641, Doc. 1; No. 4:14-cv-641, Doc. 4.

15, 2012 that acknowledge delays. Plaintiffs cite two corrective disclosures dated May 9 and 10, 2012, announcing a write-off of the drilling program. Plaintiffs also cite four statements about corporate matters which do not appear to have any connection to Plaintiffs' claims.

    *1.*     *FCPA-related Statements*

Defendants issued twenty statements disclosing a risk of FCPA violations before they disclosed the FCPA subpoenas. *See, e.g.* Doc. 56 ¶ 246 (citing September 30, 2009 Form 10-K) ("We operate in Guinea, a country where corrupt behavior exists that could impair our ability to do business in the future or result in significant fines or penalties."). Seven of the statements further revealed Hyperdynamics had found "control deficiencies" in its accounting practices in 2009. *See, e.g.,* Doc. 56 ¶ 251 (citing November 12, 2009 prospectus supplement) ("Some of the identified internal control deficiencies contributing to our material weaknesses in financial reporting relate to our operations in Guinea. These material weaknesses make it more likely that [an FCPA] violation could have occurred."). The control deficiencies are not identified in the record. Defendants state: "Hyperdynamics had historically had some difficulties—mainly during the period before the management and board were largely replaced beginning around 2009— maintaining adequate internal controls." Doc. 78 at 15. Four of the statements specifically deny violations of the FCPA. *See, e.g.,* Doc. 56 ¶ 268 (citing April 20, 2010 Form 8-K) ("Neither the Company, nor any of its Subsidiaries, nor, to the Knowledge of the Company, any director, officer, agent, employee or other Person acting on behalf of the Company or any of its Subsidiaries, has, in the course of its actions for, or on behalf of, the Company, violated or is in violation of any provision of the [FCPA].").

Defendants do not contend the statements above were adequate disclosures of FCPA-related risks. Defendants tentatively argue: "Plaintiff never meaningfully addresses the

Company's risk disclosure language, including its disclosure beginning in 2009 that certain internal control weaknesses 'make it more likely that a[n] [FCPA] violation could have occurred.'" Doc. 82 at 22–23. Defendants maintain FCPA violations did not occur.

Plaintiffs respond that the disclosures were false or misleading by omission, because violations occurred. Plaintiffs have not, however, established that FCPA violations occurred. The only authoritative evidence in the record that FCPA violations occurred is Hyperdynamics's disclosure of subpoena requests by the DOJ in September 2013 and the SEC in January 2014. Doc. 56 ¶¶ 421, 423. On March 12, 2014, Hyperdynamics's partner Tullow Guinea Limited declared these subpoenas a force majeure event but retracted the declaration in May 2014. Doc. 56 ¶¶ 425, 426. These disclosures do not establish that FCPA violations occurred or that Defendants knowingly omitted FCPA violations. *See Konkol v. Diebold, Inc.*, 590 F.3d 390, 402 (6th Cir. 2009) ("The mere existence of an SEC investigation does not suggest that any of the allegedly false statements were actually false . . . [,] nor does it add an inference of scienter." (quoting *In re Hutchinson Tech., Inc. Secs. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008))). Defendants cannot be held liable for not preempting the SEC process and issuing a public confession. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (rejecting argument that "in addition to disclosing the existence of an investigation, defendants were required to disclose that [defendant] UBS was, in fact, engaged in an ongoing tax evasion scheme," because "disclosure is not a rite of confession").

The question remains whether Plaintiffs have pleaded fraudulent omissions of facts foreseeably giving rise to FCPA investigations resulting in losses to shareholders. In addressing this question, the Court first must determine whether Plaintiffs have pleaded omissions rendering prior FCPA-related statements "in the light of the circumstances under which they were made,

not misleading." 17 C.F.R. § 240.10b-5. The Court must then determine whether the omissions plausibly satisfy all the elements of fraud set forth in *Stoneridge*, including materiality, scienter, and causation of artificially high stock prices and losses to shareholders after the subpoenas were announced. If Plaintiffs have not pleaded omissions rendering prior statements misleading, Rule 10b-5 does not apply. *Pontiac*, 752 F.3d at 184 (quoting *Ciresi v. Citicorp*, 782 F.Supp. 819, 823 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992) (holding "companies do not have a duty to disclose 'uncharged, unadjudicated wrongdoing.'")); *In re Par Pharm. Cos., Inc. Sec. Litig.*, 733 F. Supp. 668, 674-75 (S.D.N.Y. 1990) (holding an issuer is "under no duty to announce publicly that it or its officers are guilty of uncharged criminal behavior, or to accuse itself of antisocial or illegal policies"). Here, four of the FCPA-related statements specifically deny violations of the FCPA. The other sixteen FCPA-related statements disclose a general risk of FCPA violations; seven of these statements also disclose a specific risk arising from control deficiencies. As explained below, Plaintiffs have not alleged FCPA-related facts which would render either the sixteen risk disclosures or the four specific denials misleading by omission and which Defendants had a duty to disclose. Furthermore, Plaintiffs have failed to allege facts which would render the specific denials false or misleading.

The FCPA prohibits a company from making an "offer, gift, promise to give, or authorization of the giving of anything of value" to a "foreign official for purposes of . . . influencing any act or decision of such foreign official in his official capacity" in obtaining business.  15 U.S.C § 78dd-1. This prohibition does not bar a company from giving anything of value to a foreign government, as opposed to a foreign official personally, or to a third party such as a nonprofit in order to generate corporate goodwill, even if the gift indirectly influences government officials. *See* DOJ and SEC, A Resource Guide to the U.S. Foreign Corrupt

Practices Act (Nov. 14, 2012) ("The FCPA does not prohibit charitable contributions or prevent corporations from acting as good corporate citizens."). Nor does it prohibit misappropriation by a foreign official without the company's knowledge. 15 U.S.C § 78dd-1 ("corrupt" intent required by the FCPA); *see* H.R. Rep. No. 95-640, at 7 ("The word 'corruptly' is used in order to make clear that the offer, payment, promise, or gift, must be intended to induce the recipient to misuse his official position.").

Here, Plaintiffs have alleged Defendants made donations to the government of Guinea during three phases of negotiations over Hyperdynamics's concession. Plaintiffs claim these donations constituted bribery under the FCPA. The first donation occurred after Hyperdynamics received a letter in 2005 indicating the government had cancelled its concession. Defendants met with the Secretary General of Guinea at the Presidential Palace and were told the letter was a "fake" but that further review was necessary. Doc. 56 ¶ 78. On August 1, 2006, Defendant CEO Kent Watts founded a nonprofit organization called American Friends of Guinea for the purpose of making charitable contributions "for the welfare of the Guinean population." Doc. 56 ¶ 81. Shortly thereafter, on September 22, 2006, the government approved the first renegotiated concession. Doc. 56 ¶ 82.

The second instance of alleged bribery occurred during negotiations from late 2007 to 2009, after the renegotiated concession became a local news story and the government again threatened to cancel it. In September 2007, a delegation led by the Secretary General visited Hyperdynamics's office in Houston, and vice versa. Over the next year, American Friends of Guinea "delivered and paid for antibiotics and glucose fluids for men, women, and children who were stricken with cholera and quarantined as a result thereof. AFG also planned new water well projects to get to the source of solving the problem." Doc. 56 ¶ 92. In addition, Plaintiffs cite an

investor forum, www.investorvillage.com, which cites an article from a Guinean news website, www.guinee24.com, stating the Minister Secretary General "disbursed by means of [H]yperdynamics, the sum of five hundred (500) million Guinean francs, which were distributed to some of Ioubards [hooligans] Municipality of Kaloum and other districts in the capital of Guinea. Ioubards [were seen] in the streets two days before the fateful day of the strike of January 10, 2008. . . ." Doc. 56 ¶ 98. Plaintiffs allege the "hooligans" supported the President and organized street protests against the Prime Minister. Doc. 56 ¶ 97. On February 8, 2008, according to a Wikileaks cable,[2] Hyperdynamics CFO Briers met with the U.S. Embassy. The cable states, "Briers raised the issue of FCPA violations" by the Company during the meeting, and did so "without prompting." Doc. 56 ¶ 103. Briers denied the Company paid the 500 million Guinea francs to the reported hooligans. Briers also denied Hyperdynamics had paid the Secretary General "to push through their contract." Plaintiffs argue, "Despite Briers' denials of specific instances of alleged bribery, his voluntary whistleblowing of FCPA violations further reinforced the Embassy's view that Hyperdynamics was violating the act." *Id.* The cable explains the Embassy declined Brier's request for assistance in negotiating with the government on grounds that "commercial advocacy would be very difficult, if not impossible, due to the fact that the [U.S. Government] does not recognize the military junta as a legitimate government." Doc. 56 ¶ 123. According to another Wikileaks cable, Tidiane Diallo, a new employee of the Ministry of Mines who formerly worked at USAID told the Embassy, "I am sure Hyperdynamics was the minister's ticket for his appointment." Doc. 56 ¶ 110. According to the cable, Diallo

---

[2] Defendants argue the Wikileaks cable is quoted "without explanation of how the source learned the information in question, much less whether the veracity of the information was ever determined." Doc. 78 at 39. Plaintiffs do not provide authority for authenticating or taking judicial notice of Wikileaks cables. *See* James P. Kelly, Jr., *Wikileaks: A Guide for American Law Librarians*, 104 Law Libr. J. 245, 261 (2012) ("Whether WikiLeaks would qualify as such a reliable source [of which a court may take judicial notice] has yet to be judicially determined.").

based his statement on the fact that "the minister was appointed on August 27 . . . and that Hyperdynamics was at the ministry the very next day. The company's contract was reinstated a few days later." *Id.* Diallo also claimed Hyperdynamics had offered to donate $56 million to the government to pay its annual bill for power plant fuel.[3] Doc. 56 ¶ 111. The cable states:

> Diallo reportedly warned the minister of mines to reject the offer, pointing out that it is not clear what Hyperdynamics wants in return, and accepting a "donation" at this point would undermine the [government's] future bargaining power. He said that the [government] has not yet decided whether or not to accept the funds, but that the ministers of mines and finance may decide to do so because of significant budgetary pressures.

Doc. 56 ¶ 111. The embassy officer asked Diallo directly if the donation was a bribe, and Diallo responded, "yes and no." Diallo explained, "[O]n the one hand, the offer is public and no one is trying to negotiate a deal behind closed doors. At the same time, the fact that the [government] does not know what Hyperdynamics wants in return raises questions about the company's intent." Doc. 56 ¶ 112. Again, Defendants' negotiations bore fruit. On September 11, 2009, a Memorandum of Understanding was signed, partially affirming and modifying Hyperdynamics's concession. Doc. 56 ¶ 124. On September 29, 2009, Hyperdynamics made a donation to American Friends of Guinea of stock. On the same day, a director of Hyperdynamics resigned, following the firing of the CEO and resignation of the CFO and another director during the summer of 2009. Doc. 56 ¶¶ 125–126. The concession was approved by presidential decree in May 2010. Doc. 56 ¶ 65.

The third instance of alleged bribery occurred in 2011, after the concession was again disputed by the transitional government and modified by way of a mining code promulgated in

---

[3] A U.S. State Department report titled "2010 Investment Climate Statement – Guinea" describes the use of ad hoc taxes or "donations" by the government of Guinea to support government services. For instance, the President held a compulsory meeting in June 2010 announcing that all foreign businesses were obligated to pay a donation for electrical and water infrastructure. Afterwards, "many of the businesses were visited and threatened by military officials until they paid the 'donation.'" Doc. 56 ¶ 117.

September 2011. Doc. 56 ¶ 132. Plaintiffs cite testimony from confidential witness CW-1, a former Logistics Operations Manager for Hyperdynamics, alleging Hyperdynamics donated and installed $20,000 of computer equipment[4] for the Ministry of Mines in 2011 and $8,000 to $10,000 of computer equipment for the Guinean Offshore Department of Environment, "an agency that the Company helped to create from scratch."[5] Doc. 56 ¶¶ 133, 135. Plaintiffs do not specify any particular official action influenced by the computer donations. Plaintiffs also fail to plead donations to the government and the American Friends of Guinea constituted gifts to a "*foreign official* for purposes of . . . influencing any act or decision of such foreign official in his official capacity." 15 U.S.C § 78dd-1 (emphasis added).

In sum, Plaintiffs' FCPA-related fraud claims are based on speculations of uncharged, unadjudicated FCPA violations that are not plausibly material.

    2.    *Statements Related to Drilling Plans and Financial Shortfalls*

Plaintiffs cite thirteen statements by Defendants mentioning Hyperdynamics's "two well" drilling program, in spite of Defendants' alleged knowledge that a second well would not be drilled. Defendants argue the statements about the second well were immaterial, and even if the statements were material, Defendants lacked scienter.

The first eleven statements, dated February 17, 2011 to October 13, 2011, state without qualification Defendants planned to drill two wells. Six of these statements expressly describe the second well in terms of plans or goals. Doc. 56 ¶ 316 (citing March 31, 2010 Form 10-Q) ("We plan to drill two exploratory wells."); Doc. 56 ¶ 299 (citing February 17, 2011 statement by Defendant Leonard at Annual Meeting) ("[O]ur goal is to begin drilling the first of at least two wells near the end of the year."); Doc. 56 ¶ 325 (citing July 15, 2011) ("We are anticipating

---

[4] Prior to obtaining its concession in Guinea, Hyperdynamics was a value added reseller of computer hardware and software in Houston, Texas. Doc. 56 ¶ 69.
[5] It is not clear whether the alleged $20,000 donation included the $8,000 to $10,000 donation.

the drilling of the Sabu-1 and Baraka-1 exploration wells in the shallow water portion of the block in the fourth quarter of this year."); Doc. 56 ¶ 332 (citing August 8, 2011 press release) ("Hyperdynamics plans to drill its first two exploratory wells in its concession offshore Guinea."); Doc. 56 ¶ 345 (citing September 13, 2011 Form 10-K) ("We plan to drill our first well in 2011, and a second well shortly thereafter."); Doc. 56 ¶ 356 (citing October 13, 2011 press release) ("The second well, Baraka-1, is scheduled to begin immediately after Sabu-1. . . . We are excited to begin drilling operations and look forward to the results of the wells in the upcoming months."). The other five statements on or before October 13, 2011, spoken during conference calls and public conferences, use more confident future-tense language indicating the second well would in fact be drilled:

> We haven't yet decided on the exact spot to drill [the second well], and we expect to talk more about Well Number 2 on our next conference call. . . . We're looking at 45 day wells. That's our initial plan. So, with two wells drilling back to back, you can put in the timing for that. And we'll be announcing the results of the wells shortly after the completion of each one of the wells. . . .

> [T]he only official requirement that we have in the three year period from September 2010 to September 2013 is one well – and 2,000 kilometers of 3-D seismic. We've already finished the 3-D seismic requirement. *We're going to be drilling more than one well.* So, we filled the requirement. . . .

> For the first well, we're looking at a 45-day plan. If we spud near the beginning of October, you'll have it finished certainly by the end of November. But as I mentioned earlier, there are lots of moving parts in this. So that's an estimate, but that's our best estimate. And we will do the wells back-to-back, so you're looking at the same timeframe for the second well after the first one.

Doc. 56 ¶ 320 (citing June 30, 2011 conference call) (emphasis added); Doc. 56 ¶ 307 (citing April 27, 2011 conference call) ("Now that all these pieces are in place and we've hopefully removed any doubt that our exploration project is in a position to go forward as planned. . . . [T]he first two wells will be within the area that we shot the 3-D."); Doc. 56 ¶ 328 (citing July 18, 2011 statement by Defendant Leonard at industry conference) ("The first two wells, which

will be spudded in October. They will be back-to-back wells, October, and then the middle of

November are the Sabu and the Baraka prospects shown right here."); Doc. 56 ¶ 336 (citing

September 7, 2011 conference call) ("[T]he results from the initial two wells will be the major

factors in assessing the resources. . . . At the time of our last call in June, we pretty well-defined

the first well, Sabu-1. . . . But we've now completed the plans for the [second] well."); Doc. 56 ¶

353 (citing September 28, 2011 statement by Defendant Leonard during industry conference)

("Even after the initial two wells are drilled and the 3D is done, we're going to have at least half

of that amount still in the bank.").

On November 8, 2011, Defendants issued a partial corrective disclosure in a Form 10-Q.

In regard to the planned second well, Defendants stated:

> We are currently reevaluating the timing of the commencement of the second
> exploration well. We expect our decision to depend on numerous factors and
> considerations including, the suitability and cost performance of the drilling
> rig. . . . We plan to use our existing cash and proceeds from available-for-sale
> securities to fund our portion of the expenditures related to our two well
> exploration program.

Doc. 56 ¶ 360 (citing November 8, 2011 Form 10-Q). In regard to financing, Defendants stated:

> The estimated cost for our first well is higher than we expected primarily due to
> certain delays and issues related to mechanical and operational matters on the rig,
> logistical delays resulting from limited port facilities in Guinea, and an expanded
> well logging program. Our current estimate of the cost of our two well program is
> $135 million on a gross basis, or approximately $104 million based on our current
> 77% interest.

*Id.* In a conference call on the following day, Defendant Leonard clarified the plans for the

second well:

> We'll look carefully at the ongoing performance at Jasper, as they complete
> drilling the well, as well as port operations, and we'll reevaluate with our partners
> if we want to continue our original plan of drilling back to back wells using the
> Jasper Explorer. At this point, however, our plans for the next well remain
> unchanged, but as I mentioned, we are currently reevaluating the timing of the
> two-well program in light of the current operational well results of Sabu 1.

Doc. 56 ¶ 366 (citing November 9, 2011 conference call). Leonard explained the delays were caused by bottlenecks in the seaport of Conakry, the capital of Guinea, and by poor performance of the rig. Leonard stated the rig performed poorly because it was "newly refitted and re-staffed with a new crew, and in some of our initial operations, this revealed shortcomings and caused additional delays." *Id.* In regard to financing, Leonard explained, "[W]hile we believe that with our current cash resources and current cost estimates, we do have the capital resources for the two well drilling program and the 3D seismic program, we're reevaluating the timing of the second well as a result of the operational challenges on to Sabu-l." Doc. 56 ¶ 367. When an analyst pressed Leonard for a "decision tree" on when the second well would be drilled, Leonard replied:

> Well, there are three major variables in the decision making process. Number one is the performance of the Jasper Explorer. And as I mentioned before as they work through some of the initial issues, the performance is getting better, but let's see if that continues. I hope it does. Everybody will be happy if it does. The second point is the port question. Again, we have certainly made the government aware of it. And as I said before, some of the things that are done to fix the situation in the short term, make it worse, because some of the construction to such as dredging to give yourself additional space and berth at the port. In the short term the construction has - gives more congestion. But there is a - been acknowledgement that this is a problem. It's just a question of how quickly it can be fixed. And the third is the results of the well. And so you put those three things in the mix. And then you'll come out with your answer. I can't tell you what that answer is because we don't have those three pieces yet.

Doc. 56 ¶ 369.

Plaintiffs argue Defendants knew that the second well would be delayed prior to the corrective disclosure on November 8, 2011 and that the second well would never be drilled prior to the corrective disclosures on January 30, 2012 (announcing an indefinite deferral), February 15, 2012 (disclosing that first well was a dry hole), and May 9, 2012 (announcing write-off of

drilling program).[6] Plaintiffs cite internal communications at Hyperdynamics and between Hyperdynamics and its third-party well management vendor AGR Well Management Ltd. that, according to Plaintiffs, show Hyperdynamics was aware that the second well would never be drilled prior to the disclosures. First, Hyperdynamics's Logistics Operations Manager CW-1 testified he visited the Port of Conakry in February 2011 with other employees and they "knew that [bottlenecking] was going to be an issue from the start." Doc. 56 ¶ 162. CW-1 testified bottlenecking was discussed in lengthy weekly meetings conducted by Defendant Leonard. AGR Senior Drilling Engineer CW-2 testified AGR advised Hyperdynamics's drilling manager and Vice President of Operations about bottlenecking "from the very beginning" in weekly status reports. Doc. 56 ¶ 168. Second, on October 12, 2011, one day prior to commencement of drilling operations, Plaintiffs allege Hyperdynamics instructed AGR "to investigate the availability of rigs to replace the Jasper Explorer." Doc. 56 ¶ 207. Plaintiffs claim Defendants knew of equipment failures on the rig that delayed commencement by thirteen days and delayed drilling operations by four days. Doc. 56 ¶¶ 211, 222. By November 9, 2011, Plaintiffs allege Defendants were "actively seeking an alternative rig." Doc. 56 ¶ 362. Drilling operations were subsequently suspended for seven days and fourteen days due to equipment failures. Doc. 56 ¶ 222. Third, on February 2, 2012, Hyperdynamics "provided AGR with its instruction to not proceed to execute its option to drill the [second well]." Doc. 56 ¶ 210. None of the internal reports and emails

---

[6] In the 61 statements submitted by Plaintiffs, Defendants never expressly state the second well will not be drilled. On the contrary, the corrective disclosures indicate the second well may still be drilled depending on "additional cash resources through equity or debt financings, sales of additional interests in the Concession, or through other means." Doc. 56 ¶ 379 (citing January 30, 2012 Form 8-K). Plaintiffs do not plead drilling the second well with additional funding or a new drilling contractor was impossible. Plaintiffs repeatedly describe the May 9, 2012 Form 10-Q, which disclosed the amortization of exploration and production costs, as a corrective disclosure of a decision not to drill the second well. Doc. 56 ¶¶ 21, 238, 378, 390, 402, 460. Plaintiffs provide no explanation of how this decision may be inferred from the May 9, 2012 Form 10-Q and the contrary language in the January 30, 2012 Form 8-K. Plaintiffs' FCPA-related claims should thus be limited to the issue of whether Defendants fraudulently stated a second well would be drilled according to the plans and estimates in the statements. As explained below, plans and estimates generally fail to meet the materiality threshold.

submitted by Plaintiffs, however, indicate Defendants decided not to drill a second well with a different well management provider.

Plaintiffs argue the instruction to AGR not to proceed with a second well shows Defendants knew the first well was a dry hole prior to the February 15 disclosure. Plaintiffs suggest Hyperdynamics should have known and disclosed to the public in "real time" that the well was a dry hole, since it had immediate access to logging information. Doc. 56 ¶ 398. Plaintiffs argue Defendants fraudulently omitted the fact that the well was a dry hole in the February 13, 2012 announcement stating: "Results of real-time hydrocarbon chromatograph measurements and Schlumberger petrophysical wireline analysis warranted collection of downhole fluid samples. These samples, together with sidewall cores taken, are being sent to Core Lab for analysis." Doc. 56 ¶ 396. Plaintiffs do not allege any facts that would suggest the announcement was false or that further analysis was not warranted prior to disclosing the well was a dry hole.

Finally, Plaintiffs argue Defendants' estimates of drilling costs were false or misleading. Defendants' estimates were produced by AGR's proprietary P1$^{TM}$ modelling software. Doc. 56 ¶ 340. The software generated overall time and cost estimates based on estimates for each item of drilling costs and expected delays for a "rig that has spent several years in shipyards for major refits and installations of new equipment." Doc. 78 at 25. To determine the estimates, AGR conducted 10,000 cost simulations using a range of values for each item of drilling costs. The total estimates were then plotted on a curve ranging from "P0" to "P100." The "P" numbers refer to "cumulative probability [%]."Doc. 78-3 at 39, Doc. 78-8 at 14. A P0 cost estimate is the value to which no simulation resulted in equal or lower costs, i.e. the value to which there is a 0%

probability actual costs will be less or equal.[7] A P100 estimate, on the other hand, is the value to which there is a 100% probability that actual costs will be less or equal. A P50 or "Pmean" estimate is the value compared to which 50% of actual costs will be above and 50% below. The AGR Contract Management Plan (CMP), approved by Hyperdynamics, represents the Pmean as the "AGR Point Estimate" and compares it to "Expected Cost" in similar cost models. Contract, Doc. 78-4 at ¶ IV(2); Contract Management Plan, Doc. 78-6 at 25–26. Defendants state, "AGR made it clear these 'Pmean' values reflected the most likely outcomes. AGR itself used them as the standard basis for the AFEs on its projects, including the Hyperdynamics drilling campaign." Doc. 78 at 24. The CMP itself describes the Pmean in more ambiguous terms, explaining that it is "analogous" to an AFE estimate with an accuracy of +10%/-5%. Doc. 78-6 at 25. AGR's pre-tender proposal states: "As a result of this approach [using P1 models] AGR has delivered each of our last 5 wells within a range of -10% to +3% of the planned AFE cost." Doc. 78-3 at 12. The P1 models prepared by AGR for Hyperdynamics include charts showing estimates from P5 to P95. At the top of the charts, Pmean, P10, and P90 estimates are indicated. P0 and P100 estimates are not shown. Docs. 78-8 to 78-11, 78-15. Plaintiffs state: "[O]perating under the P50 analysis was unreasonable given the known risks that impacted virtually every aspect of the drilling program." Doc. 56 ¶ 152. Plaintiffs argue even the P100 estimate would be too low; "the P1[TM] analysis cannot quantify the 'absolute worst case' scenario because it only represents probabilities and not certainty." Doc. 56 ¶ 155. Plaintiffs cite AGR's statement in parallel litigation that "the risk of greater costs and delays to drill Sabu-1 was not, and could not be, eliminated for any number on the probability scale whether at P50 or P100." This is a circular

---

[7] Confusingly, Plaintiffs define P0 as "greatest probability not to occur" and P100 as "greatest probability to occur," Doc. 56 ¶ 151, while Defendants define P0 as "certain to occur" and P100 as "certain not to occur." Doc. 78 at 16. Accurately stated, P0 is the estimate for which there is the greatest probability or certainty that higher costs will occur and conversely that lower costs will not occur, and vice versa for P100. In parallel litigation, Defendants describe P100 as the "absolute worst case." Doc. 78-5 at 8.

argument. The P1 estimates were estimates, not facts, representing the costs of every aspect of the drilling program. *See* Doc. 78-3 ¶ 3.6.1 (describing P1 model as "fully risked"). Plaintiffs appear to argue that the use of cost estimates and budgets is inherently unreasonable. Plaintiffs have not alleged any facts that would show it was unreasonable for Defendants to rely on the Pmean estimates provided by AGR.

Defendants' allegedly fraudulent statements regarding cost estimates are not inconsistent with the P1 models they received from AGR, although the numbers do not exactly match. On August 10, 2011, AGR sent Defendants a P1 model with the following estimates for the first well:

| | P10 | Pmean | P90 |
|---|---|---|---|
| **First Well**[8] | $27.7 million[9] | $32.5 million | $38.3 million |

Doc. 78-7 at 13. On September 7, 2011, AGR sent Defendants an updated model with the following estimates:

| | P10 | Pmean | P90 |
|---|---|---|---|
| **First Well** | $28.3 million | $35 million | $43.2 million |
| **Mobilization & Demobilization**[10] | $21.3 million | | |

---

[8] The record does not include a P1 estimate dated August 10, 2011 for the second well. Also, it is not clear whether the mobilization and demobilization (Mob/Demob) cost for one or both wells is included in the drilling cost estimate. The P1 model includes "Rig Mobilization . . . total USD 3,600,000, 50% per well," "Rig Demobilization . . . total USD 950,000, 50% per well," Doc. 78-7 at 10, and "Move Rig to Drilling Location, [$]3,901,492." Doc. 78-7 at 42.  AGR's "Design Rationale Document" dated August 2011 states the model includes the lump sum cost of rig mobilization from Singapore to Guinea but not equipment mobilization to the rig in Singapore or equipment demobilization. Doc. 78-7 at ¶ 4.16.1.

[9] Defendants state the August 10, 2011 estimates were in dollars (Doc. 78 at 24) but the P1 model indicates Pounds Sterling. Doc. 78-7. The August 30, 2011 Design Rationale Document, Doc. 78-7 at 81, and updated P1 models state dollars for similar amounts suggesting a labeling error.

[10] It is not clear whether the mobilization and demobilization (Mob/Demob) estimate is included in the well drilling cost estimate. Both P1 models include rig mobilization. [First well] P-1 Model, Doc. 78-8 at 44 ("Phase 1 – Move Rig to Drilling Location, [$]2,347,903"); Mob-Demob P-1 Model, Doc. 78-8 at 70 ("Move Rig to Drilling Location, [$]6,759,130"). Defendants describe the Mob/Demob P1 Model as a "separate breakout," suggesting it is included in the P1 model for the well. Doc. 78 at 25. In parallel litigation, however, Defendants describe the Mob/Demob cost as not included and apportion half to each well as additional costs. *SCS Corp. v. AGR Well Mgmt. Ltd.*, Claim No. HT-12-194, High Court of Justice Queen's Bench Division, Technology & Construction Court (April 11, 2014), Doc. 78-3 at ¶4(5). Plaintiffs state the Mob/Demob estimate is not included in the well estimate. Doc. 56 ¶ 153.

Doc. 78-8 at 14. On September 7, 2011, Defendant Leonard stated estimated drilling cost for *both* wells was $80 million, adding, "We have adequate funding for the two well program and the additional 3-D survey of the deeper water, so we're under no pressure whatsoever to farm out an additional interest in another company."   Doc. 56 ¶ 337 (citing September 7, 2011 conference call). In its subsequent annual report, Hyperdynamics announced a "revised budget of $95 million for 2011. The revised budget includes the previously approved drilling of two exploration wells planned for the fourth quarter, as well as the new seismic survey." Doc. 56 ¶ 346 (citing September 13, 2011 Form 10-K). On September 20, 2011, Defendants entered an agreement for the 3D seismic survey expected to cost $29 million. Doc. 56 ¶ 236. On October 12, 2011, AGR sent Defendants a revised model for both wells corrected for currency conversion errors:

| | P10 | Pmean | P90 |
|---|---|---|---|
| **First Well** | $37.3 million | $45.8 million | $56.2 million |
| **Second Well** | $41.5 million | $51 million | $62.4 million |
| **Mobilization & Demobilization**[11] | $26.2 million | | |

Doc. 78-8 at 129. On November 8, 2011, Defendants issued a partial corrective disclosure in its quarterly report, stating:

> The estimated cost for our first well is higher than we expected primarily due to certain delays and issues related to mechanical and operational matters on the rig, logistical delays resulting from limited port facilities in Guinea, and an expanded well logging program. Our current estimate of the cost of our two well program is $135 million on a gross basis, or approximately $104 million based on our current 77% interest.

Doc. 56 ¶ 237 (citing November 8, 2011 Form 10-Q). The following chart summarizes the October 12, 2011 estimates, current as of the November 8, 2011 statement (the only cited

---

[11] Again, it is not clear to what extent the Mob/Demob estimate may overlap with the well estimates. All three P1 models include rig mobilization. [First well] P-1 Model, Doc. 78-8 at 114 ("Phase 1 – Move Rig to Drilling Location, [$]1,704,996"); [Second well] P-1 Model, Doc. 78-9 at 57 ("Phase 1 – Move Rig to Drilling Location, [$]3,250,521"); Mob-Demob P-1 Model, Doc. 78-8 at 140 ("Move Rig to Drilling Location, [$]5,319,320").

statement issued after Defendants had received estimates for both wells), compared with Hyperdynamics's September 30, 2011 reported assets:

| ASSETS | | | |
|---|---|---|---|
| Cash + AFS[12] | $128 million | | |
| **COSTS** | **P10** | **Pmean** | **P90** |
| First Well | $37.3 million | $45.8 million | $62.4 million |
| Second Well | $41.5 million | $51 million | $62.4 million |
| Mob/Demob | $26.2 million | $26.2 million | $26.2 million |
| Seismic Survey | $29 million | | |
| TOTAL COSTS | $134 million | $152 million | $180 million |
| 77% share of " " | $103.2 million | $117 million | $138.6 million |
| **BALANCE** | $36 million | $25 million | $11.3 million |

For each of the P10, Pmean, and P90 estimates, Defendants had a positive balance of liquid assets minus estimated costs, suggesting Defendants had sufficient funds to carry out the drilling program. Plaintiffs do not plausibly allege "Hyperdynamics had little to no funds available to mobilize and drill [the second well] without outside money." Doc. ¶ 237.

Plaintiffs allege on September 7, 2011 AGR provided a P100 estimate of $97 million for the first well. Doc. 56 ¶ 155. This estimate would result in a deficiency of $12.3 million. The P1 model submitted in the record, however, does not include a P100 estimate. The model includes charts and tables showing only estimates from P5 to P95, as well as a table of "histogram data" with the results of simulations used to calculate the probability of costs for drilling the first well, displayed in $1000 increments. The last ten items are as follows:

| Cost Range | Probability |
|---|---|
| $76000-77000 | 0.01 |
| $77000-78000 | 0 |
| $78000-79000 | 0 |
| $79000-80000 | 0.01 |
| $80000-81000 | 0 |
| $81000-82000 | 0 |

---

[12] As of September 30, 2011, Hyperdynamics reported $74 million in cash and $54 million in available-for-sale (AFS) securities, totaling $128 million. Doc. 56 ¶ 237.

| | |
|---|---|
| $82000-83000 | 0 |
| $83000-84000 | 0 |
| $84000-85000 | 0 |
| $85000-86000 | 0.01 |

Doc. 78-8 at 45. The purported P100 estimate is derived by adding the highest possible cost ($86,000) according to the last listed simulation result out of 10,000 simulations, showing a .01% chance of $85000-$86000 costs, plus one-half of $21.3 million mobilization/demobilization costs ($10.65 million), equaling $96.65 million. As explained above, a P100 estimate represents the value for which AGR determined there was a 0% probability of greater costs. Plaintiffs point out Hyperdynamics had an additional $800,000 monthly "cash burn" for "SG&A," apart from drilling and seismic costs, but this amount is not enough to create a deficiency over the estimated time period.

In sum, the P1 models in the record do not plausibly support a claim that Defendants misrepresented cost estimates or the adequacy of their funds. Defendants' statements were reasonably consistent and not directly contrary to the estimates they had received from AGR. *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433–34 (5th Cir. 2002) ("[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture.") (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) and distinguishing *Serabian v. Amoskeag Bank Shares,* 24 F.3d 357, 365 (1st Cir. 1994) which the court cited for the proposition that a "statement that loss reserves were adequate, conservative and cautious directly contrary to identified internal reports was sufficient to state a claim.").

In addition to P1 models, Plaintiffs allege AGR sent an email to Defendants on January 27, 2012 stating AGR was "committed to completing the Hyperdynamics Sabu #1 well and de-mobbing the rig" and that "the Inventory cannot be viewed as part of the primary funding

process" due to difficulty in selling unused equipment, eliminating funds available for the second well with a different rig. Doc. 56 ¶ 239. Plaintiffs argue this email shows the "handwriting was clearly on the wall that the Company would not be drilling the [second] well. But, investors did not learn of this crucial fact for months – until May 9, 2012." Doc. 56 ¶ 378. On the contrary, Hyperdynamics released a statement three days later on January 30, 2012 explaining:

> After consideration of the suitability and cost performance of that rig and the effect of the delays and increased cost on our liquidity and capital resources, we plan to defer the commencement of the next exploration well. Our ability to drill a second well will depend on obtaining additional cash resources through equity or debt financings, sales of additional interests in the Concession, or through other means.

Doc. 56 ¶ 379. Plaintiffs do not plead the January 30, 2012 filing fraudulently omits any information from the January 27, 2012 email.

Applying the materiality test under Rule 10b-5, Plaintiffs' fail to plead material omissions regarding drilling plans and cost estimates. First, Hyperdynamics's eleven statements regarding the company's future plans to drill two wells are immaterial under the exception for forward-looking statements[13] or, alternatively, under the bespeaks caution doctrine. 15 U.S.C. § 77z-2 (defining forward-looking statements broadly and expressly including "statements of the plans and objectives of management for future operations"). Furthermore, none of the statements "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," in particular the fact that Hyperdynamics had no prior oil

---

[13] Plaintiffs cite two statements regarding drilling plans and cost estimates as "not forward-looking," both of which appear forward-looking. Doc. 56 ¶ 299 (citing February 17, 2011 statement at industry conference) ("[O]ur goal is to begin drilling the first of at least two wells near the end of the year."); Doc. 56 ¶ 353 (citing September 28, 2011 conference call) ("[E]ven after the initial two wells are drilled and the 3D is done, we're going to have to at least half of that amount still in the bank. So we're entirely funded and solid with no financial difficulties and ready to move forward."). Plaintiffs cite eleven statements as "statements of mixed tense" without explanation. Doc. 80 at 21. None of the cited statements can be plausibly read to misrepresent or omit existing facts as to the feasibility of and adequacy of funding for the second well. The statements do include representations as to existing finances and operational status, but these are not alleged to be fraudulent except insofar as they misrepresented by omission Defendants' plans and estimates, which are not material.

exploration experience and that its sole asset was an unproved concession in Guinea. *Basic,* 485 U.S. at 231. Plaintiffs do not plausibly allege the day-to-day equipment delays in the fall of 2011 precluded a second well or were otherwise material prior to the disclosure on November 8, 2011. Doc. 56 ¶ 360. Similarly, Plaintiff does not explain how "real time" logging information was material prior to the disclosure of the dry hole. Doc. 56 ¶ 398. Second, Plaintiffs fail to plead Hyperdynamics's statements regarding cost estimates were not "reasonably consistent with reasonably available data," in particular the Pmean estimates. *Abrams*, 292 F.3d at 433.

In regard to scienter, Plaintiffs have not alleged facts that would support a strong inference of knowledge or severe recklessness as to the fraudulent nature of statements regarding the second well and adequacy of funding. As explained above, Plaintiffs have not pled any of the statements were false or misleading when made. Furthermore, Plaintiffs have not pled Defendants intentionally misrepresented AGR's time and cost estimates, that they presented them to shareholders knowing they were misleading, or that the estimates presented an "obvious danger of misleading buyers of Defendant[s'] securities as to the value of the company's assets" which should have been known to Defendants. *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014) (holding statements plausibly suggesting oil was found in dry hole and unexplored concession may have been obviously misleading). In parallel litigation, a New York State Court dismissed misrepresentation claims against Defendants under a lower standard of negligence. *Iroquois Master Fund Ltd. v. Hyperdynamics Corp., et al.*, Index No. 651614/2012 (N.Y. Sup. Ct. June 19, 2013). Hyperdynamics, in turn, sued AGR for its failure to meet the time and cost estimates on which Defendants relied, obtaining a $17.7 million settlement. Form 8-K (May 22, 2014), Doc. 78-10 at 31 (citing *Jasper Drilling Private Ltd. v. AGR Well Mgmt. Ltd.*, No. HT-13-100, High Court (Technology & Construction) (Eng.)).

In regard to proximate causation, Plaintiffs have adequately pled a "connection" between the alleged fraudulent statements and a purchase or sale of Hyperdynamics stock, according to the liberal "touch" test. *Alley v. Miramon*, 614 F.2d 1372, 1378 (5th Cir. 1980). The Court presumes the statements affected the market price of Hyperdynamics stock and that Plaintiffs relied on the statements, and Defendants have not rebutted the presumption. *Halliburton II*, 134 S. Ct. at 2408. Plaintiffs have provided a schedule of transactions showing some sales indicating economic losses. Plaintiffs have not, however, pleaded loss causation by connecting each loss to the value of the securities in the absence of a fraudulent statement, as required by the PSLRA. 15 U.S.C. § 78u-4 ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). Plaintiffs have the burden of showing it is more probable than not that a substantial amount of the decline of Hyperdynamics's stock was a result of corrective disclosures as opposed to other depressive factors. *Amedisys,* 769 F.3d at 320-21. Other factors may include "changed investor expectations" and "firm-specific facts, conditions, or other events." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343. Here, firm-specific facts affecting Hyperdynamics's stock price included Hyperdynamics's failure to find commercial quantities of oil. Plaintiffs allege eleven statements in 2011 fraudulently referred to "two wells" and unreasonable cost estimates. According to Plaintiffs, these statements artificially inflated the stock price. Only after the February 27, 2011 and July 15, 2011 statements, which offered general statements of confidence prior to the alleged delays and cost overruns, did the stock price increase (6% and 4%). Otherwise, the stock price declined slightly in the day after the statements, -1% on average. In between, the stock price swung widely, including declines up to 24% and gains up to 40%, with an average gain of 4% in between statements. When

Hyperdynamics disclosed the well was a dry hole, the stock price declined 29%, following a decline of 20% over the two previous days after a cautionary announcement that Hyperdynamics was analyzing the results. The stock price declined another 44% over the next three months prior to announcing amortization of drilling costs, which resulted in a 4% decline. In total, the announcement of the dry hole resulted in a 70% decline. Plaintiffs have not alleged facts which would show it is more probable than not that their losses, in general, resulted from corrective disclosures related to cost overruns and drilling plans for the second well. The Court, however, will not undertake an independent analysis of each of the 22 cited price changes to determine if there is any plausible connection between a price change and a statement regarding the second well or funding, since the statements were immaterial.

Plaintiffs have failed to allege facts that would show materiality, scienter, and loss causation under Rule 10b-5. Plaintiffs chose to invest in a wildcat well in Guinea with an inexperienced operator having full knowledge of the geological, operational, and regulatory risks. Rule 10b-5 does not entitle them to a return on this investment.

## III.    Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Defendant's Motion to Consolidate (Doc. 57) is **DENIED**, and

**ORDERED** that Defendant's Motion to Dismiss (Doc. 78) is **GRANTED**.

SIGNED at Houston, Texas, this 25th day of August, 2015.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE